1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
                                    FILED
                          CLERK, U.S. DISTRICT COURT

                          7/30/2024

                          CENTRAL DISTRICT OF CALIFORNIA
                          BY: ____CDO____ DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2024 Grand Jury

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

HENRY LOCONTI,
JOHN FLYNN,
  aka "John Hogg,"
  aka "John Murphy,"
SHOAIB AHMAD,
  aka "Shoba,"
  aka "Shobi,"
  aka "Shobie,"
  aka "Shoby,"
TIMOTHY MUNOZ,
  aka "Tim Munoz,"
ERIC CRESPIN,
  aka "Eric Marin," and
LEZLI ST. HILL,
  aka "Lez,"
  aka "Liz,"

        Defendants.

CR No. 24-00219(A)-MCS

F I R S T
S U P E R S E D I N G
I N D I C T M E N T

[18 U.S.C. § 1962(d): Racketeer
Influenced and Corrupt
Organizations Conspiracy; 18
U.S.C. § 1343: Wire Fraud; 18
U.S.C. §§ 1963 and 982: Criminal
Forfeiture]

//

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1962(d)]

[ALL DEFENDANTS]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this First Superseding Indictment:

1.   Defendants HENRY LOCONTI; JOHN FLYNN, also known as ("aka") "John Hogg," aka "John Murphy"; SHOAIB AHMAD, aka "Shoba," aka "Shobi," aka "Shobie," aka "Shoby"; TIMOTHY MUNOZ, aka "Tim Munoz"; ERIC CRESPIN, aka "Eric Marin"; and LEZLI ST. HILL, aka "Lez," aka "Liz", and others known and unknown to the Grand Jury, were members and associates of a criminal organization referred to hereinafter as "THE ENTERPRISE."  In furtherance of a scheme to fraudulently obtain money from American consumers' bank accounts, members and associates of THE ENTERPRISE engaged in, among other things, mail, wire, and bank fraud; identity theft; access device fraud; and money laundering.  THE ENTERPRISE operated in the Central District of California and elsewhere.

2.   THE ENTERPRISE, including its leaders, members, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity.  THE ENTERPRISE constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of THE ENTERPRISE.  THE ENTERPRISE engaged in, and its activities affected, interstate and foreign commerce.

3.   Members and associates of THE ENTERPRISE played different roles at different times:

2

1          a.   Merchants:   Merchants used business entities (each a

2  "Shell Entity") to offer to consumer-victims subscriptions for some

3  service or product, such as cloud storage, for a recurring charge.

4  In fact, the Shell Entities served as cover for a scheme to make

5  unauthorized debits against consumer-victims' bank accounts (the

6  "Consumer Bank Accounts").   Merchants purchased identifying and

7  financial information of consumer-victims, at times through brokers,

8  and caused unauthorized debits to be originated against Consumer Bank

9  Accounts, many of which were held or serviced by federally insured

10 financial institutions (the "Consumer Banks").   These unauthorized

11 debits removed funds from the Consumer Bank Accounts and caused them

12 to be deposited into bank accounts controlled by or for the Shell

13 Entities (each a "Shell Entity Bank Account") at "Originating Banks,"

14 sometimes each called an "ODFI," many of which were also federally

15 insured.

16         b.   Payment processors:   Through their Originating Banks,

17 payment processors operated some Shell Entity Bank Accounts for

18 merchants.   The payment processors facilitated the merchants'

19 debiting of the Consumer Bank Accounts.   These debits sometimes

20 resulted in rejected or "returned" transactions (each a "return"),

21 including returns based on complaints by consumer-victims that the

22 transactions were unauthorized.   Payment processors helped process

23 returns and conducted other financial transactions for the merchants.

24         c.   Signers:   Signers served as nominal owners of Shell

25 Entities and/or Shell Entity Bank Accounts.   Signers generally helped

26 merchants and brokers create, open, and control the Shell Entities

27 and Shell Entity Bank Accounts.

28

d.   Lead list sources:  "Lead lists" contained identifying and financial information of prospective consumer-victims, including bank routing numbers and bank account numbers.  Lead list sources generally sold lead lists (at times referred to as "traffic") to merchants.

e.   Brokers:  Brokers helped merchants find payment processors, signers, lead list sources, and other assistance.

B.   MEMBERS AND ASSOCIATES OF THE ENTERPRISE

4.   The defendants' roles in THE ENTERPRISE were:

a.   Defendant LOCONTI, a resident of Chardon, Ohio, was a broker.

b.   Defendant FLYNN, a resident of Canada, assisted Merchant-1 (which term is defined below) in Merchant-1's role as a merchant.

c.   Defendant AHMAD, a resident of Canada, was a merchant.

d.   Defendant MUNOZ, a resident of Wilmington, California, was a lead list source.

e.   Defendant CRESPIN, a resident of Canada, assisted Merchant-1 in Merchant-1's role as a merchant.

f.   Defendant ST. HILL, a resident of Canada, assisted Merchant-1 in Merchant-1's role as a merchant.

5.   The following persons, each of whose identity is known to the Grand Jury, were members and associates of THE ENTERPRISE:

a.   "CC A-1," a resident of Hawaiian Gardens, California, was president of a company headquartered in the Central District of California ("Company A").  Both personally and through Company A, CC A-1 was primarily a broker and at times a merchant.  Company A maintained one or more email servers located in the Central District

4

of California that routed email communications between Company A personnel, including CC A-1 and others, and other members and associates of THE ENTERPRISE located outside this district.

b.   "CC A-2," a resident of Huntington Beach, California, was a broker who primarily worked for CC A-1 at Company A and, at times, used a Company A email account.

c.   "CC A-3," a resident of Long Beach, California, assisted CC A-1 in CC A-1's roles as a broker and as a merchant and, at times, used a Company A email account.

d.   "Merchant-1," a resident of Canada and Cyprus, was primarily a merchant and at times a lead list source.  Merchant-1 controlled one or more email accounts hosted by a third party located in Arizona, some of which were used by defendants FLYNN, CRESPIN, and ST. HILL.

e.   "Merchant-2," a resident of Canada, was a merchant who primarily worked with Merchant-1.

f.   "Processor-1," a resident of Las Vegas, Nevada, was president of a payment processor.

g.   "Broker-1," a resident of Waianae, Hawaii, was a broker.

h.   "Signer-1," a resident of Waianae, Hawaii, was a signer who worked for Broker-1.

i.   "Signer-2," a resident of Montreal, Canada, was a signer who worked for defendant AHMAD.

j.   "Signer-3," a resident of Huntington Beach, California, was a signer who primarily worked for CC A-1.

5

k.    "Signer-4," a resident of Las Vegas, Nevada and Pittsburg, California, was a signer who primarily worked for Merchant-1.

C.    PURPOSES OF THE ENTERPRISE

6.    The purposes of THE ENTERPRISE included:

a.    Enriching the members and associates of THE ENTERPRISE through fraud;

b.    Obtaining, preserving, and protecting the proceeds of THE ENTERPRISE through acts of money laundering; and

c.    Protecting THE ENTERPRISE, its members and associates, and its unlawful activities from detection by financial institutions, government agencies, and others.

D.    THE MANNER AND MEANS OF THE ENTERPRISE

7.    Defendants LOCONTI, FLYNN, AHMAD, MUNOZ, CRESPIN, and ST. HILL, and other members and associates of THE ENTERPRISE, agreed to conduct and participate in the conduct of the affairs of THE ENTERPRISE, through the following means, among others:

a.    Members and associates of THE ENTERPRISE bought and sold lead lists containing identifying and financial information of prospective consumer-victims for the purpose of fraudulently obtaining money from the consumer-victims by making unauthorized debits against those consumer-victims' Consumer Bank Accounts. Members and associates of THE ENTERPRISE vetted lead lists through a "scrub," by making test credits ("penny" or "micro" credits) to the Consumer Bank Accounts on the lists, and through other means.  The scrubbing process would remove from the lead lists, for example, closed Consumer Bank Accounts that would cause returns on debit attempts.

6

b.   Members and associates of THE ENTERPRISE created, and caused to be created, Shell Entities, and obtained the use of, and controlled, Shell Entity Bank Accounts.

c.   Members and associates of THE ENTERPRISE recruited domestic signers to, among other purposes, help conceal connections between domestic Shell Entities and Shell Entity Bank Accounts and foreign members and associates of THE ENTERPRISE.  Members and associates of THE ENTERPRISE managed these signers through interstate and foreign email, messaging, and telephone communications.

d.   Using the lead lists and other sources of prospective consumer-victim information, members and associates of THE ENTERPRISE originated debits, and caused debits to be originated, for the benefit of Shell Entities, against Consumer Bank Accounts.  THE ENTERPRISE caused millions of dollars in unauthorized debits against Consumer Bank Accounts for the benefit of the members and associates of THE ENTERPRISE.

e.   To conceal and continue their unauthorized debits against Consumer Bank Accounts and conceal their returns and return rates, and continue to collect the proceeds of the fraud, members and associates of THE ENTERPRISE took the following actions, among others:

i.   Members and associates of THE ENTERPRISE created websites for some Shell Entities to give the impression those entities were providing legitimate services and products, even though the websites sometimes lacked functionality and few, if any, actual customers subscribed to services through them.

ii.  When a Consumer Bank, Originating Bank, or other person or entity requested proof of authorization ("POA") for a debit

against a Consumer Bank Account, members and associates of THE ENTERPRISE created false and fraudulent documentation to be presented to the requester, claiming that the consumer-victim had authorized the debit, as a payment to a Shell Entity for a subscription for a service and product provided by the Shell Entity, by signing up for the Shell Entity's service and product through the Shell Entity's website.

iii. Members and associates of THE ENTERPRISE monitored the Shell Entities' return rates and took steps to ensure that the return rates did not affect the ability of THE ENTERPRISE to continue the fraudulent debiting of Consumer Bank Accounts, including the following:

(I) Members and associates of THE ENTERPRISE knew and believed that the number of returns, and a Shell Entity's percentage of returns in comparison to all debits ("return rate"), often caused and would have caused scrutiny from the Originating Banks. For example, members and associates of THE ENTERPRISE knew and believed that, for Automated Clearing House ("ACH") debits, National Automated Clearing House Association ("NACHA") rules imposed certain thresholds for acceptable return rates and certain obligations on Originating Banks to monitor return rates. Members and associates of THE ENTERPRISE knew that high return rates could cause the Originating Banks to stop originating debits for the Shell Entities and therefore restrict the members' and associates' ability to further debit Consumer Bank Accounts.

(II) Depending on the return rates of the unauthorized consumer-victim debits, members and associates of THE ENTERPRISE regularly caused their Originating Banks to originate, for

1    the Shell Entities, thousands of "micro" debits (also referred to as

2    "affiliate" or "friendly" items or transactions) against Shell Entity

3    Bank Accounts at other financial institutions, withdrawing a small

4    amount of money with each debit.  Since members and associates of THE

5    ENTERPRISE controlled the Shell Entity Bank Accounts, they knew these

6    micro debits would not result in returns and would therefore

7    artificially suppress the Shell Entity return rates at Originating

8    Banks to levels that, as the members and associates understood and

9    believed, would avoid Originating Banks' scrutiny and potential

10   termination of banking services.

11            iv.  When some consumer-victims discovered the

12   unauthorized debits, members and associates of THE ENTERPRISE, at

13   times through purported "customer service" personnel, used refunds

14   and other means to dissuade consumer-victims from reporting the

15   debiting Shell Entities to Consumer Banks, government agencies, and

16   others.

17            f.  After proceeds of unauthorized debits from the

18   Consumer Bank Accounts were credited to Shell Entity Bank Accounts,

19   members and associates of THE ENTERPRISE caused some of the proceeds

20   to be funneled to other Shell Entity Bank Accounts in order to fund

21   the micro debits the members and associates of THE ENTERPRISE used to

22   conceal and disguise Shell Entity return rates and in order to

23   promote and prolong their scheme.  Members and associates of THE

24   ENTERPRISE, at times, also caused some of the proceeds to be

25   transferred from domestic Shell Entity Bank Accounts to accounts

26   outside the United States in transactions designed in whole and in

27   part to conceal and disguise the nature, source, ownership, and

28   control of the proceeds.

E.    THE OBJECT OF THE CONSPIRACY

8.    Beginning on or about September 18, 2015, and continuing through January 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendants LOCONTI, FLYNN, AHMAD, MUNOZ, CRESPIN, and ST. HILL, and others known and unknown to the Grand Jury, being persons employed by and associated with THE ENTERPRISE, which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly, willfully, and unlawfully conspired with each other, and with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of THE ENTERPRISE through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts indictable under:

        a.    Title 18, United States Code, Section 1341 (relating to mail fraud);

        b.    Title 18, United States Code, Section 1343 (relating to wire fraud);

        c.    Title 18, United States Code, Section 1344 (relating to financial institution fraud);

        d.    Title 18, United States Code, Section 1028 (relating to fraud and related activity in connection with identification documents);

        e.    Title 18, United States Code, Section 1029 (relating to fraud and related activity in connection with access devices);

        f.    Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments); and

g.   Title 18, United States Code, Section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).

9.   It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of THE ENTERPRISE.

F.   OVERT ACTS

10.   In furtherance of the conspiracy, and to accomplish its object, on or about the following dates, defendants LOCONTI, FLYNN, AHMAD, MUNOZ, CRESPIN, and ST. HILL, together with others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California and elsewhere:[1]

Overt Act No. 1:   On December 4, 2015, Merchant-1 emailed defendant FLYNN, asking that defendant FLYNN make sure that the lead lists they purchased included Internet Protocol ("IP") addresses for the consumer-victims.

Overt Act No. 2:   On December 7, 2015, CC A-2 sent an email to defendant FLYNN, copying CC A-1 and Merchant-1 and attaching two lead lists containing 4,024 and 13,426 leads, respectively, stating, "I would go through though and make sure the consumers age is okay with you guys.  I did notice some (only a few) that were pretty old."

Overt Act No. 3:   On December 30, 2015, in response to an email from defendant FLYNN to defendant LOCONTI and CC A-1 that

---

[1] Unless indicated otherwise in brackets, phrases in quotation marks reproduce the original spellings, spacings, case, emphases, and ellipses.

11

1  stated, "batch 1 - 1000 micros[;] - no scrub[.]  batch 2 - 253
2  orders[;] - YES scrub and process," defendant LOCONTI sent an email
3  to defendant FLYNN and CC A-1, stating in part, "Can you please send
4  more micro debit to offset the high returns for this month. Need to
5  send them ASAP so not to miss the cutoff."

6      Overt Act No. 4:   On December 30, 2015, following defendant
7  LOCONTI's email referenced in Overt Act No. 3, defendant FLYNN sent
8  an email to defendant LOCONTI and CC A-1, stating, "Ok I just
9  uploaded another micro batch 1500 orders."

10     Overt Act No. 5:   On February 24, 2016, in response to an
11  email from CC A-2 to defendant MUNOZ, copying CC A-1, that requested
12  leads, including "ID Theft leads", "PDL long form leads", and "ID
13  theft/Medical for 50yrs old and up to 70", defendant MUNOZ sent an
14  email to CC A-2, stating in part, "I've attached a 1k sample of a
15  buyers file for the ID theft sales. I can get them for you for 10
16  cents."  Attached to defendant MUNOZ's email was a lead list
17  containing 1,000 leads.

18     Overt Act No. 6:   On April 6, 2017, CC A-1 sent an email to
19  defendant FLYNN, copying defendant CRESPIN, Merchant-1, CC A-2, and
20  others, regarding instructions to integrate with Company A's
21  processing gateway.

22     Overt Act No. 7:   On April 12, 2017, in response to Merchant-1
23  forwarding to defendant FLYNN an email that Signer-4 had originally
24  received from a Better Business Bureau ("BBB") for Shell Entity
25  Ecloud Secure, defendant FLYNN sent an email to Merchant-1, asking,
26  "why is [Signer-4] using the same gmail address for multiple corps at
27  the BBB?  this draws a direct line between the corps."

28

1    <u>Overt Act No. 8</u>:   On September 22, 2017, defendant CRESPIN

2    sent an email to defendant FLYNN, Merchant-1, and Merchant-2,

3    attaching an instruction manual created by defendant CRESPIN

4    regarding the use of the software application he created for them to

5    generate and track transactions, including micro debits.

6    <u>Overt Act No. 9</u>:   On April 16, 2018, Merchant-1 forwarded to

7    defendant ST. HILL an email from Merchant-2 explaining his scrubbing

8    process and suggesting how to respond to a Virginia State Attorney

9    General inquiry about a consumer complaint, stating, "We kill most

10   .GOV on the way in.  I always scroll and look for any suspicious

11   emails.  Banks, GOV police, lawyers etc etc.  Personally I would not

12   provide a POA to an AG unless the AG specifically asks.  I would go

13   with, we reviewed the case of Mr's X and deem it to be a valid

14   sale.  We have since refunded ...etc etc We consider that matter

15   closed.  Again, don't offer up a POA on a platter to an AG."

16   <u>Overt Act No. 10</u>:   On June 28, 2018, in an email chain

17   regarding transactions for Shell Entities Silver Safe Box and Dollar

18   Web Sales, Processor-1 sent an email to defendant CRESPIN, Merchant-

19   1, and others, stating in part, "I'm very concerned that without the

20   affiliate transactions the return rates will raise eyebrows at the

21   bank … we need to ensure the affiliate items ( $ 1.35 per item ???)

22   are part of the equation here [. . .] We don't want the bank to see

23   the 1st week of batches have 20% return rates because the affiliate

24   CCD items are missing."

25   <u>Overt Act No. 11</u>:   On September 20, 2018, Broker-1 sent an

26   email to CC A-1 and CC A-2, stating, "As I told [CC A-1], we put

27   [Signer-1] on the app for US purposes" and including as an attachment

28   Processor-1's company's "New Merchant Questionnaire" for Shell Entity

1  "IKALLS," which listed a single "owner/officer," Signer-1, with
2  address in Waianae, Hawaii, and 51 percent ownership, and which
3  answered in the negative to the question, "Is there any foreign (non-
4  U.S.) ownership in this Company?"

5      Overt Act No. 12:  On September 25, 2018, Broker-1 forwarded to
6  CC A-1 and CC A-2 an email from defendant AHMAD with the subject
7  "Articles of ikalls" in which defendant AHMAD wrote, "Hi [Broker-1],
8  Please see attached documents.  Thanks[,]" writing "see attached,
9  [Signer-1] is a signer on the operating agreement and is President."
10  Attached to Broker-1's email was a "Limited Liability Company
11  Operating Agreement of IKALLS, L.L.C."  The operating agreement
12  purported to be executed by Signer-1, as Operating Manager, and
13  Signer-2, as President.  Schedule A to the operating agreement listed
14  two members of the company, their addresses, and percentage interest:
15  Signer-1, with address in Waianae, Hawaii, and 51 percentage
16  interest, and Signer-2, with address in Saint-Laurent, Quebec,
17  Canada, and 49 percentage interest.

18      Overt Act No. 13:  On September 27, 2018, CC A-2 sent an email
19  with the subject "iKalls LLC Merchant Submission" to Processor-1,
20  copying CC A-1 and CC A-3, in which CC A-2 wrote, "Please see the
21  attached merchant submission."  Attached to CC A-2's email were
22  Processor-1's company's "New Merchant Questionnaire" for Shell Entity
23  "IKALLS" referenced in Overt Act No. 11 and the "Limited Liability
24  Company Operating Agreement of IKALLS, L.L.C." referenced in Overt
25  Act No. 12.

26      Overt Act No. 14:  On November 26, 2018, in response to an
27  email from Broker-1 to defendant AHMAD that copied CC A-1 and CC A-2
28  and asked CC A-2 to "fill Shoby in and better explain" three steps

14

that Broker-1 and defendant AHMAD needed to take to keep their "account functional," CC A-2 advised regarding the "micro credit" or "penny credit" that "If the customer's account doesn't exist, doesn't match, etc. (return codes for R-2,3 and 4's usually) this is where they will be caught (roughly 90% or higher) of those returns will be caught here."  CC A-2 also stated, "We have seen merchants that operate in the 30-40% return rate get down to half of that with doing this process.  It not only drops your overall return rate and looks better to the bank, but it drops down your returns costs."  CC A-2 further stated, "On top of all of this there will be micro debit transactions that will probably be needed in order to stay within the NACHA guidelines for unauthorized returns to be under 0.50%," and explained how to use micro debits.

Overt Act No. 15:  On December 10, 2018, in response to an email from Merchant-1 to a payment processor, copying defendant LOCONTI, regarding Shell Entity Ecloud Secure in which Merchant-1 signed the email in Signer-4's name but used an email address in Merchant-1's name, defendant LOCONTI emailed Merchant-1, stating, "[Merchant-1] you used the wrong email address with [payment processor]."

Overt Act No. 16:  On January 31, 2019, defendant ST. HILL tested the web signup function for Shell Entity NRG Support using the name "lezli rich."

Overt Act No. 17:  On January 31, 2019, defendant FLYNN forwarded to Merchant-1 an email notification generated by the test referenced in Overt Act No. 16, asking, "[Merchant-1], someone just signed up for NRG – strange.  is this you testing?"

15

Overt Act No. 18:  On January 31, 2019, in response to Merchant-1 forwarding to defendant ST. HILL the email from defendant FLYNN referenced in Overt Act No. 17 and asking, "Was this you ?", defendant ST. HILL stated, "YES."

Overt Act No. 19:  On February 18, 2019, defendant FLYNN sent an email to a Company A employee, attaching a false and fraudulent POA for Shell Entity My Kloud Box.

Overt Act No. 20:  On April 3, 2019, in an email chain regarding submitting transactions for Shell Entity Silver Safe Box to a payment processor in which defendant CRESPIN used an email address with the domain for Shell Entity NRG Support, defendant LOCONTI sent an email to defendant CRESPIN and CC A-1, copying Merchant-1, stating in part, "Why do you use an email address that gets you in trouble with processors? [. . .] You signed up as Silver Safe Box, not NRG… This is what started all the trouble over at [other payment processor]. This is simple merchant 101 how to stay in business tactics. Eric I suggest getting a Silver Safe Box email address (or at least a Gmail address) when working with [this] processor I set [Merchant-1] up with so he can not get into trouble like with [other payment processor]."  Defendant LOCONTI's email also linked to a BBB webpage of complaints against Shell Entity NRG Support.

Overt Act No. 21:  On April 3, 2019, in response to defendant LOCONTI's email referenced in Overt Act No. 20, defendant CRESPIN sent an email to defendant LOCONTI and CC A-1, copying Merchant-1, stating in part, "Yes that was a mistake. [. . .] Will use a generic gmail account for the future."

Overt Act No. 22:  On June 14, 2019, defendant AHMAD sent an email to CC A-1 and Broker-1, attaching a "Membership Interest

16

Purchase Agreement," purporting to be signed by Signer-2 on June 14, 2019 in Montreal, Canada, which purported to demonstrate that Signer-2 transferred all interest in Shell Entity iKalls to Signer-1.

Overt Act No. 23:  On June 18, 2019, CC A-2 emailed Processor-1, copying CC A-1 and CC A-3, and others, under subject "iKalls Updated Documents."  CC A-2 stated, "[Processor-1], Please find the attached requested documents which reflect the LLC's new Operating Agreement, Updated EIN and the Purchase Agreement between buyer and seller."  Attached to CC A-2's email was a "Membership Interest Purchase Agreement," purporting to be signed by Signer-1 on June 14, 2019 in the State of Hawaii and by Signer-2 on June 14, 2019 in Montreal, Canada, which purported to demonstrate that Signer-2 transferred all interest in Shell Entity iKalls to Signer-1.

Overt Act No. 24:  On August 26, 2019, defendant CRESPIN sent an email to Merchant-1, listing 11 login user names and passwords to their file transfer protocol (FTP) server in the Republic of Türkiye.

Overt Act No. 25:  On September 16, 2019, in response to Merchant-1 forwarding to defendant MUNOZ some transaction results for a lead list from defendant MUNOZ and complaining, "The result of that file is 7.25 % .... Good to bill ! [. . .] You used to sell me .50 per order for better results !!", defendant MUNOZ emailed to Merchant-1, "You do not know how hard it is to find new sources. [. . .] The idea is to increase your database and that's what this accomplishes."

Overt Act No. 26:  On February 10, 2020, CC A-1 emailed defendant AHMAD, copying Broker-1 and CC A-2, stating "Shoby[,] Please read email received from [Processor-1].  Do not submit new traffic until we connect you with the scrub [CC A-2] has."  CC A-1

17

1    continued, "This account is going to blow up if we cant get the

2    re5urns under control for new business."  Copied in CC A-1's email

3    was the following message from Processor-1:  "You probably also need

4    to get involved with where they are buying their data.  The penny

5    credit file from last week had 95% returns.  The bank will surely ask

6    me to explain those results."

7        Overt Act No. 27:  On February 10, 2020, in an email exchange

8    following the email from CC A-1 referenced in Overt Act No. 26, CC A-

9    2 responded to Broker-1, copying CC A-1 and defendant AHMAD:  "I'll

10   have to get you the file format first thing in the morning. You don't

11   need all of the information to be filled out though, just routing and

12   account and it will give you back a positive or negative result file.

13   It might also be wise to have the lead broker just log in before

14   selling any leads, upload the file and see how many are actually

15   clear before buying them. I mentioned this before to Shobie as well

16   and it's why it scrubs just based on minimal info rather than someone

17   having to provide everything."

18       Overt Act No. 28:  On April 9, 2020, in response to an email

19   from defendant FLYNN, copying Merchant-1, requesting defendant ST.

20   HILL to list for Merchant-1 all of her email addresses and what she

21   uses them for, defendant ST. HILL discussed 14 email addresses with

22   domains associated with Shell Entities Ecloud Secure, Gigatech, My

23   Kloud Box, NRG Support, and Silver Safe Box.

24       Overt Act No. 29:  On July 16, 2020, CC A-1 sent an email to

25   Merchant-1 and defendant AHMAD with the subject "Better Quality

26   Traffic."  CC A-1 wrote, "[Merchant-1], I spoke with Shoby this

27   morning regarding setting up a conference call with you to discuss

28   the possibilities of assisting Shoby in acquiring better quality

                                    18

traffic from you directly. Could we possibly do that call at 8:30AM my time, 11:30 Montreal? Please advise if that works. If so, I'll initiate the call, connect you two then provide cell numbers in an email."

Overt Act No. 30: On July 22, 2020, defendant FLYNN sent an email to CC A-2, in which, at Merchant-1's request, defendant FLYNN asked CC A-2 to identify Shell Entity Gigatech's correct Internet domain.

Overt Act No. 31: On November 18, 2020, CC A-1 emailed defendant AHMAD, under subject "1K CA Leads," stating, in part, "Shobi, Please find the attached 1k CA leads," and attaching a file named "Shobi 1k Leads.xlsx," which was a lead list that contained 1,000 leads, all with addresses in California.

Overt Act No. 32: On December 10, 2020, Signer-3 sent CC A-3 multiple text messages that provided the names and telephone numbers for consumer-victims H.C. and M.M.

Overt Act No. 33: On December 10, 2020, Merchant-1 emailed a user at the domain for Shell Entity NRG Support, directing them to call three consumer-victims of a different Shell Entity and copying defendant ST. HILL and CC A-3. Merchant-1's email forwarded another email from CC A-3 that included the names and telephone numbers of the three consumer-victims, D.Q., H.C., and M.M., and stated, "The following customers have called regarding their account. Please note [Signer-3] does his best to get the consumers name, some are willing and some are not so compliant. I get the information directly from him."

Overt Act No. 34:  On January 31, 2021, defendant LOCONTI forwarded to CC A-1 an email from Merchant-1 regarding a new payment processing relationship for Shell Entity Silver Safe Box.

Overt Act No. 35:  On March 10, 2021, defendant AHMAD caused a wire transfer in the amount of $500 to be sent to fund a domestic bank account ("Account A") that was managed by Company A personnel and used to fund micro debits for Shell Entities controlled by both Merchant-1 and defendant AHMAD.

Overt Act No. 36:  On March 16, 2021, Merchant-1 caused a wire transfer in the amount of $5,000 to be sent to Account A.

COUNTS TWO THROUGH SIX

[18 U.S.C. § 1343]

[ALL DEFENDANTS]

11.  The Grand Jury realleges paragraphs 1 through 7 and 10 of this First Superseding Indictment here.

A.  THE SCHEME TO DEFRAUD

12.  Beginning on or about September 18, 2015, and continuing through January 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendants LOCONTI, FLYNN, AHMAD, MUNOZ, CRESPIN, and ST. HILL, and others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud financial institutions, as defined in Title 18, United States Code, Section 20, including Originating Banks and Consumer Banks, as to material matters, and to obtain money and property from the Originating Banks and Consumer Banks by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

13.  The fraudulent scheme operated, in substance, in the manner set forth in paragraph 7 of this First Superseding Indictment.

B.  THE USE OF THE WIRES

14.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, the following defendants, for the purpose of executing the above-described scheme to defraud affecting a financial institution, transmitted, and caused the transmission of, the following items by means of wire and radio communication in interstate and foreign commerce:

21

| COUNT | DATE | DEFENDANT(S) | ITEM WIRED |
|-------|------|--------------|------------|
| TWO | 12/30/2015 | LOCONTI and FLYNN | Interstate email from defendant FLYNN to CC A-1 described in Count One, Overt Act No. 4 |
| THREE | 2/24/2016 | MUNOZ | Interstate email from defendant MUNOZ to CC A-2 described in Count One, Overt Act No. 5 |
| FOUR | 4/3/2019 | LOCONTI and CRESPIN | Interstate email from defendant CRESPIN to CC A-1 described in Count One, Overt Act No. 21 |
| FIVE | 6/18/2019 | AHMAD | Interstate email from CC A-2 to Processor-1 described in Count One, Overt Act No. 23 |
| SIX | 12/10/2020 | ST. HILL | Interstate email from Merchant-1 to CC A-3 described in Count One, Overt Act No. 33 |

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.   Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 1963, in the event of any defendant's conviction of the offense set forth in Count One of this First Superseding Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

a.   Any interest the convicted defendant has acquired or maintained as a result of such offense;

b.   Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the convicted defendant has established, operated, controlled, conducted, or participated in the conduct of, as a result of such offense;

c.   Any property constituting, or derived from, any proceeds which the convicted defendant obtained, directly or indirectly, from racketeering activity as a result of any such offense; and

d.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.   Pursuant to Title 18, United States Code, Section 1963(m), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the

property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of any defendant's conviction of the offenses set forth in any of Counts Two through Six of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

a.    All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

b.    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

1  substantially diminished in value; or (e) has been commingled with

2  other property that cannot be divided without difficulty.

3

4                                    A TRUE BILL

5

6                                         /s/
                              _____

7                              Foreperson

8  E. MARTIN ESTRADA
   United States Attorney

9

10

11 MACK E. JENKINS
   Assistant United States Attorney

12 Chief, Criminal Division

13 KRISTEN A. WILLIAMS
   Assistant United States Attorney

14 Chief, Major Frauds Section

15 MONICA E. TAIT
   Assistant United States Attorney

16 Major Frauds Section

17 AMANDA N. LISKAMM
   Director, Consumer Protection Branch

18 United States Department of Justice

19 WEI XIANG
   MEREDITH B. HEALY

20 AMY P. KAPLAN
   Trial Attorneys

21 Consumer Protection Branch
   United States Department of Justice

22

23

24

25

26

27

28

                              26